### LEDERER v. ADLER et al.

(Supreme Court, Appellate Term. March 21, 1905.)

1. CONSPIRACY—SCHEME TO DEFRAUD—EVIDENCE.

In an action for conspiracy to defraud plaintiff's assignors by inducing them to sell goods to an irresponsible person, evidence *held* insufficient to sustain a verdict for plaintiff.

2. SAME—DECLARATIONS OF CO-CONSPIRATOR.

Declarations of a co-conspirator, made after the completion of a criminal enterprise, relating to a past transaction, and accompanying no act done in furtherance of the enterprise, are incompetent against the other conspirators.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§ 996–998.]

Appeal from City Court of New York, Trial Term.

Action by Emil Lederer against Ettie Adler and others. From a City Court judgment in favor of plaintiff, and from an order denying defendants' motion for a new trial, they appeal. Reversed.

See 88 N. Y. Supp. 1010.

Argued before SCOTT, O'GORMAN, and BLANCHARD, JJ.

Benjamin Reass, for appellants.

Henry Kuntz, for respondent.

SCOTT, J.   The proof, assuming that it proved everything plaintiff
claims for it, does not satisfy the allegations of the complaint.   The
complaint alleges that the defendants therein named, to wit, Ettie Adler
and the defendants Lazarus, entered into a conspiracy to cheat and de-
fraud plaintiff.   The evidence does not connect Ettie Adler with any
conspiracy at all.   If any one conspired, it was Jacob Adler, and it was
the question of his participation which was submitted to the jury.   This
variance does not, perhaps, affect the present judgment, but may be-
come important if a new trial be had.   That there must be a new trial,
I am satisfied.   The allegation, in general, is that Jacob Adler and the
defendants Lazarus, entered into a conspiracy to defraud plaintiff's as-
signors by inducing them to sell goods to Adler, who was irresponsible,
and who in fact purchased such goods for the defendants Lazarus.
The transactions said to have been induced by this conspiracy were
all concluded before March 5, 1904, and on that date the cause of action
was assigned to this plaintiff.   Whatever cause of action the plaintiff
has, must have been complete on that day; and consequently the crim-
inal enterprise which he alleges, and of which he complains, must have
been then completed.   Jacob Adler, as it is said, disappeared for a
time; but on March 14th he visited plaintiff's assignors, and made cer-
tain declarations and confessions to them concerning the complicity
of the defendants Lazarus with the alleged fraud.   This evidence was
clearly incompetent, and, having been properly objected to, its admis-
sion constitutes error, for which the judgment must be reversed.   It
is, of course, well settled that, after the fact of a conspiracy has been
prima facie established, the acts, admissions, and declarations of any
one of the conspirators, done and made during the pendency of the
criminal enterprise, and in pursuance and furtherance thereof, may be
received in evidence against all the conspirators; but the declarations,
even of a co-conspirator, made after the completion of the criminal
enterprise, relating to a past transaction, and accompanying no act done
in furtherance of the enterprise, is incompetent against the other con-
spirators.   N. Y. Guar. & Ind. Co. v. Gleason, 78 N. Y. 503, 514;
People v. McQuade, 110 N. Y. 284, 307, 18 N. E. 156, 1 L. R. A. 273.
This evidence was most important, and perhaps essential to the plain-
tiff's recovery.   Certainly without the evidence a verdict for defend-
ants would have been justified.

Judgment should be reversed and a new trial granted, with costs
to appellants to abide the event.

O'GORMAN, J., concurs in result.

BLANCHARD, J.   This action is brought to recover damages for
fraud and conspiracy, and, as such, was tried and submitted to the
jury.   The trial resulted in a judgment in favor of the plaintiff.   The
testimony to support the cause of action, briefly stated, is as follows:
Max Sayer, one of plaintiff's assignors, called in behalf of the plaintiff,
testified:   That he was a member of the firm of Sayer & Harris.   That
the firm's business was that of dealing in raw and dressed furs, under
the firm name of Sayer & Harris, at 165 Greene street.   That prior to
the 25th day of February, 1904, he knew the defendants Wolf Lazarus,.

Morris Lazarus, and Harris Lazarus. That Harris and Morris Laza-
rus were copartners in the business of manufacturing furs, and that
Wolf Lazarus, who is their father, is in the same line. On February
25, 1904, he met Adler in his place of business. With Adler at that
time was Otto Miarswa, and Adler asked him if he had some goods,
and the witness answered, "Yes." About two days after that he saw
Adler, together with Lazarus Bros., at his place of business. Lazarus
Bros. asked him if he (the witness) had some raw mink skins to
sell. Thereupon the witness showed them the goods. "The Lazarus
Bros. looked over the minks together with the man whom they had
brought with them—A. B. Berliner. They said they would buy that
lot of 367 minks, and they agreed upon a price, $2.35 apiece. Lazarus
was satisfied with the price. He said, 'Well, you charge up those minks
to Adler.' I said, 'Mr. Lazarus, I do not know Adler, I never saw him
before, and I do not want to sell him those goods.' Lazarus said,
'Well, I buy those goods, and I will give you half a check, and what-
ever he buys I am good for.' He said: 'Any checks or notes he gives
you, we are good for. All the goods he makes up, we buy of him,
and we will secure your goods.'" To which the witness answered,
"If you say so, all right; it is all right." Lazarus said: "I will give
you a check for a certain sum, $475, and the balance Adler will give
you a note. We will be good for the money." The bill for the goods
chosen on that day was about $864, and on that day the witness got by
a check from Lazarus Bros. $449. This check was given on the
Van Norden Trust Company, and made payable to the firm of Sayer
& Harris. For the balance they gave him a check of Jacob Adler for
$100, dated on the same day the goods were bought—February 25,
1904. The agreement was that the check should be paid within 20
days. And they also gave a note signed by Jacob Adler for the sum of
$287. Adler signed the note under the name of "E. Adler." He said
that was his name, and gave the witness his card. He (Adler) did not
say that he was doing business in the name of his wife. The note was
for $287 and some cents. The note was identified by the witness. It
was signed in the presence of Lazarus Bros., and it was delivered to the
witness at the same time it was made. The goods purchased were
delivered. After the goods were counted and packed in the box, Adler
said, "Send them right over to E. Adler," and he (Adler) would send
them to the dresser. The first time after the 25th of February, 1904,
that the witness saw any of the parties to that transaction, was on the
3d day of March, 1904. On that day the witness spoke to Wolf
Lazarus. Wolf Lazarus came in, and saw a lot of raw coon skins in
the witness' place. He then said, "I will send in my man Adler to ex-
amine the goods." Adler came in, looked over the lot of goods, and
they made a bargain. Adler looked over the goods, and said, "All
right, I will buy them." The witness answered, "I want cash for the
goods." He said: "Well, I can't give you all cash. I tell you what
I'll do Mr. Sayer: I will give you a hundred dollars in cash, and the
balance I will give you a check for three hundred dollars; and that
leaves two hundred and fifty dollars balance, and that is only a small
amount." Before the deal was closed, the witness Sayer went up to
Lazarus Bros., at 163 Mercer street, and had a conversation with

Moe Lazarus. He said to Mr. Lazarus that Adler bought a lot of goods, and wanted the goods delivered; that Adler had given him a check for $300, and he paid $100 in cash, and asked him: "What do you think? Shall I accept the check?" To which Moe Lazarus answered: "Certainly. Sell him all he wants. He is a great worker, and, whatever he makes up, we buy from him. You need not be afraid. You can sell him anything he wants." The witness Sayer then said: "Well, Mr. Lazarus, I can't afford to give him so much credit." And Lazarus answered: "Well, every cent you give him, we are good for." After he had this conversation with Lazarus, the witness went back to his shop and directed the delivery of the goods. The $300 check was not paid. Sayer deposited that check in the bank, but there was no money in the bank, and he never received any money on it. The $100 check which he had received in the first transaction he gave back to Adler, who gave him $100 in cash for the same.

This summary of the testimony is taken substantially from the respondent's brief, and the record shows that it is stated in a form most favorable to the plaintiff. It clearly indicates that the goods were sold to one Jacob Adler (not a party to this action) and to the defendants Lazarus, and not to Adler alone. It also shows that the credit was not given to Adler at all, but to the Lazarus parties. It also very clearly indicates that the vendors, Sayer & Harris, knew that Adler was acting in the interest of the Lazarus defendants, as their representative, and that they were to get from Adler all the goods delivered to him by Sayer & Harris. Upon the sales no credit whatever was given to Adler, for the vendors at all times dealt with the Lazarus parties as the responsible vendees. There is no evidence that any representations were made as to the financial responsibility or solvency of Adler, but on the contrary, it appears that the vendors treated him as not financially responsible. The facts proved present none of the essential features of a sale of goods on credit obtained through fraud and conspiracy. The vendors appear to have made the sales without any investigation of the financial responsibility of any of the vendees, and appear to have relied solely upon the promise of the Lazarus parties that they would pay for the goods.

The plaintiff failed to prove his cause of action, and the judgment and the order denying the defendants' motion for a new trial should therefore be reversed, and a new trial ordered, with costs to the appellant to abide the event.